Philip L. Martin (USB 11923)
**VALLIS LEGAL, PLLC**
1445 North 1200 West
Orem, UT 84057
(385) 429-0484
philip@vallislegal.com

Jeff Toppel (*pro hac vice application pending*)
**BRUECKNER SPITLER SHELTS PLC**
8355 East Hartford Drive, Suite 200
Scottsdale, Arizona 85255
(480) 483-9600
jtoppel@bss.law
*Attorneys for Plaintiff The Flower Shop*

---

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH**

---

| | |
|---|---|
| TRUE NORTH OF UTAH, LLC, D/B/A THE FLOWER SHOP, a Utah limited liability company,<br><br>        Plaintiff,<br><br>vs.<br><br>NATIONAL LABOR RELATIONS BOARD, a federal administrative agency, CRYSTAL STOWE CAREY, in her official capacity as General Counsel of the NLRB; JAMES R. MURPHY, in his official capacity as Chairman of the NLRB; DAVID M. PROUTY and SCOTT A. MAYER, in their official capacity as Board Members of the NLRB; and GEOFFREY CARTER, in his official capacity as an Administrative Law Judge of the NLRB,<br><br>        Defendants. | **PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**<br><br>Civil No. 1:26-cv-00108-CMR<br><br>Magistrate Judge Cecilia M. Romero |

Plaintiff True North of Utah, LLC d/b/a The Flower Shop ("TFS") moves the Court,

pursuant to Federal Rule of Civil Procedure 65(a), for an emergency order preliminarily enjoining

ongoing administrative proceedings against TFS, to be entered against Defendants National Labor Relations Board ("NLRB"), NLRB General Counsel Crystal Stowe Carey, NLRB Chairperson James R. Murphy, NLRB Board Members David M. Prouty and Scott A. Mayer, and NLRB Administrative Law Judge ("ALJ") Geoffrey Carter who has been assigned to preside over an administrative hearing that is set to begin in or around Ogden, Utah on July 21, 2026.

## INTRODUCTION

This case involves an administrative proceeding in which the NLRB has accused TFS of violating federal labor law relating to the termination of four employees. In a Complaint issued on June 18, 2026, the Board seeks to remedy various alleged unfair labor practices through an administrative hearing before an NLRB ALJ pursuant to the NLRB's Rules and Regulations.  First, the NLRB wrongfully asserts jurisdiction over an employer who operates solely by virtue of state law and whose existence remains unlawful under federal not based on a legislative or regulatory mandate, but a thirteen-year-old Associate General Counsel Memorandum that any basis in law. Moreover, the scheduled proceeding violates the United States Constitution in three ways: (1) the administrative hearing is being conducted by an ALJ who is unconstitutionally exercising executive functions while being insulated from removal by the President in violation of Article II of the Constitution; (2) the Members who lead the NLRB are likewise unconstitutionally insulated from removal; and (3) the proceeding violates TFS's Seventh Amendment right to a jury trial because, under NLRB precedent, the NLRB awards legal damages. There is little doubt that TFS will succeed on the merits of each of these claims.

The harm that TFS will suffer if forced to participate in this hearing is actual, specific and concrete.  At the same time, the balance of equities and public interest weigh in favor of granting

2

a preliminary injunction where TFS is seeking to stop "the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

For the reasons explained below, this Motion presents grounds for injunctive relief given the rapidly approaching hearing date. Moreover, the NLRB addressed these issues in numerous other courts, so the burden of responding on an expedited basis should be limited.

## BACKGROUND

### I.     The Flower Shop's Operations.

TFS is a Utah limited liability company organized for the specific purpose of operating a cannabis operation pursuant to the Utah Medical Cannabis Act, Utah Code § 26B-4-216, *et al.* (the "Cannabis Act").  [Verified Complaint at ("VC") at ¶ 34]  The Cannabis Act requires TFS to operate subject to certain very strict requirements.  [*Id*. at ¶ 35]  Central to the Cannabis Act's requirements, operators are only permitted to sell medical cannabis to individuals that are "medical cannabis cardholders."  [*Id*. at ¶ 36]  TFS may not operate a medical cannabis pharmacy without a Utah license and its continued ability to operate is entirely dependent upon its compliance with the requirements of the Cannabis Act.  [*Id*. at ¶ 37]

TFS's approach was and continues to be a focus on using industry standard practice to provide pure, safe, and natural products to its Utah patients.  [*Id*. at ¶ 13]  TFS serves medical patients in Utah under programs administered by the Utah Department of Agriculture and Food ("UDAF"). UDAF has promulgated specific rules and regulations that govern the conduct of the pharmacies.  [*Id*. at ¶¶ 14-15]

Amongst these requirements, the Cannabis Act requires pharmacy applicants to identify the proposed name and address, ownership/control information, bond or cash-account information,

fees, and an operating plan.  [*Id*. at ¶ 38]  Prior to opening, TFS had to satisfy location restrictions established by the state of Utah and must only operate at a physical address provided to the UDAF.  [*Id*. at ¶ 39]

There are several other important compliance obligations that TFS must adhere to for the privilege to operate under Utah law.  For example, TFS must maintain real-time inventory tracking through Utah's Electronic Verification System, dispense only through licensed medical cannabis pharmacies to authorized patients, and transport cannabis only through specified licensed channels with a transportation manifest.  [*Id*. at ¶ 41]  Additionally, the Cannabis Act includes requirements for individuals seeking employment with TFS.  Before an individual can be employed by TFS, the Act requires that the individual first be registered with the UDAF, which includes a requirement that the prospective employee submit a fingerprint card and pass a background check.  [*Id*. at ¶¶ 42-43]

TFS's compliance obligations are significant under Utah law.  And yet even if TFS satisfies this high burden, TFS is still not permitted to operate in interstate commerce because the medication it sells was unlawful under federal law until limited rescheduling occurred earlier this year.  And even then, it is permitted only if TFS is operating under a qualifying state medical-marijuana license – a license which strictly prohibits TFS from engaging in the interstate sale of its product: cannabis.  Therefore, absent TFS's strict adherence to the licensing requirements of the Cannabis Act, TFS's entire existence would be unlawful.

## II.    The Unfair Labor Practice Charges.

On April 25, 2024, the United Food and Commercial Workers, Local 99 (the "Union") filed a charge with the NLRB in case number 27-CA-340860 (the "NLRB Case") alleging TFS

violated Sections 8(a)(1) and (3) of the NLRA, 29 U.S.C. § 158(a).  In response to the NLRB's request for evidence, TFS submitted a position statement and supporting evidence refuting the allegations on August 9, 2024. The Union amended its charge in the NLRB Case to add new allegations on three separate occasions: June 7, 2024, April 15, 2026, and May 12, 2026.  TFS responded to multiple requests from the NLRB seeking additional evidence in the NLRB Case, providing evidence refuting these additional allegations.

On June 18, 2026, the Regional Director for Region 27 of the NLRB issued an administrative complaint and notice that an administrative hearing would occur before an ALJ on July 21, 2026 (the "Complaint").  [*See* Ex. A to Complaint]  On June 22, 2026, the parties were informed that the NLRB Case had been assigned to ALJ Geoffrey Carter, the Associate ALJ in the NLRB's Washington, D.C. office of its Division of Judges.  On July 7, 2026, the NLRB issued 9 subpoena *ad testificandum* to TFS – signed by Chairman James Murphy – seeking to compel the attendance of 9 witnesses to the July 21, 2026 hearing.  **[Ex. A]**  At the same time, the NLRB issued a subpoena *duces tecum* seeking the required production of certain documents for the hearing as well.  **[Ex. B]**

The pending Complaint and ongoing investigations are adversely affecting TFS's ability to operate its business. Above and beyond the significant litigation costs and attorneys' fees TFS has, and will continue, to incur to prepare for the administrative hearing and to respond to the administrative charges, the NLRB's proceedings directly interfere with its operations because key personnel are, and increasingly will be, preoccupied preparing for an unconstitutional proceeding that will violate its Seventh Amendment rights.

## ARGUMENT AND AUTHORITIES

A court should grant preliminary injunctive relief when a plaintiff shows that (1) it is likely to succeed on the merits of the claim; (2) it is likely to suffer irreparable injury absent preliminary relief; (3) the balance of equities tip in its favor; and (4) the public interest favors an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As explained below, TFS meets all these requirements and, therefore, the Court should grant TFS's requested relief.

I.    **TFS is Likely to Succeed on the Merits of its Jurisdictional Claims.**

A.    **The NLRB's Assertion of Jurisdiction over a State-Licensed Cannabis Employer is an Unlawful Overreach.**

TFS is a Utah limited liability company organized for the specific purpose of operating a cannabis operation under the Cannabis Act, Utah Code § 26B-4-216, *et al.* [VC At ¶ 34] The Cannabis Act is a closed-stated regulatory system that requires TFS to operate subject to strict requirements.  The Cannabis Act requires strict compliance with state regulations on the following subjects:

- A person may not operate a medical cannabis pharmacy without a Utah license.

- Applicants must identify the proposed name and address, ownership/control information, bond or cash-account information, fees, and an operating plan.

- Operators are only permitted to sell medical cannabis to individuals that are "medical cannabis cardholders" in the state of Utah.

Operators must satisfy location restrictions within the state of Utah.

- Operators must only operate at the physical address within the state provided to the Utah Department of Agriculture.

- Operators must maintain real-time inventory tracking through Utah's Electronic Verification System, dispense only through licensed medical cannabis pharmacies to authorized patients, and transport cannabis only through specified licensed channels within the state with a transportation manifest.

- Complying with state requirements for individuals seeking employment with a cannabis operator, which requires that the individual first be registered with the Utah Department of Agriculture and submit a fingerprint card and pass a background check.

[VC at ¶ 35-43; *see also* the Utah Medical Cannabis Act, Utah Code § 26B-4-216, *et al.*]

At the same time, cannabis has long been classified as a Schedule I drug under the Controlled Substances Act, making it unlawful under federal law. Any *interstate* manufacture, distribution, dispensing, or possession with intent to distribute marijuana would fall outside the Cannabis Act and remain subject to federal controlled-substance restrictions, including 21 U.S.C. § 841(a)'s prohibition on manufacturing, distributing, dispensing, or possessing with intent to distribute or dispense a controlled substance except as federally authorized.

At the time of the conduct giving rise to the NLRB Case in 2024, cannabis was classified as a Schedule I drug under federal law. In 2026, the federal government placed marijuana products regulated under a qualifying state medical-marijuana license into Schedule III. *See* Schedules of Controlled Substances: Rescheduling of Food and Drug Administration–Approved Products Containing Marijuana and Marijuana Subject to a Qualifying State-Issued License, 91 Fed. Reg. 28, XXX (Apr. 28, 2026) (final rule). Therefore, in Utah, absent licensing and strict adherence to the requirements of the Cannabis Act, the cultivation and sale of cannabis remains unlawful under federal law.

Further, notwithstanding the rescheduling of medical-marijuana into Schedule III, the state laws of Utah (and of all other states with state legal medical marijuana programs) expressly prohibit the transportation of medical cannabis across state lines. The Cannabis Act makes clear that it is unlawful for medical cannabis operators to: (1) transact with persons not registered with

the state of Utah; (2) deliver medical cannabis to persons or locations located outside of the state of Utah; and (3) accept medical cannabis from persons or sources located outside of the state of Utah. These restrictions, by their very nature, render the activities of medical cannabis businesses in Utah (and every other state) inherently intrastate. *See, e.g.*, Utah Code Ann. §§ 4-41a-404, 1102, 1203.

The NLRA was enacted by Congress to "eliminate the causes of certain substantial obstructions to the free flow of commerce…." 29 U.S.C. § 151. As a result, the NLRA limits the NLRB's jurisdiction to private employers "affecting commerce." Specifically, the NLRA provides the following definitions:

> (6) The term "commerce" means trade, traffic, commerce, transportation, or communication *among the several States, or between the District of Columbia or any Territory of the United States* and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country.

> (7) The term "affecting commerce" means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce.

29 U.S.C. §152 (6), (7) (emphasis added). Section 14(c)(1) of the NLRA empowers the Board to exercise discretion to decline jurisdiction where it determines that the effect of a labor dispute on commerce is "not sufficiently substantial to warrant the exercise of its jurisdiction." 29 U.S.C. § 164(c).

The NLRA does not expressly authorize the NLRB to assert jurisdiction over state-cannabis employers. At least one Circuit Appellate Court Judge has recognized the contradiction that results when a federal agency asserts jurisdiction over an employer operating in a federally

unlawful market.  In his concurrence in *Absolute Healthcare v. National Labor Relations Board,* 103 F.4th 61 (D.C. Cir. 2024), Circuit Judge Walker stated:

> Congress empowered the National Labor Relations Board to protect the labor rights of certain employees of certain employers that affect interstate commerce. It is an undeniably broad grant of jurisdiction. But it may not be quite as broad as the NLRB assumes.

> Consider the facts of this case. The NLRB ordered a criminal enterprise called Curaleaf Gilbert to pay a drug dealer to sell illegal drugs. That is a curious order from the branch of government tasked with faithfully executing federal law…

> Indeed, Congress tasked the NLRB with holding employers accountable when they violate federal labor law. But that's when the enterprise is otherwise legitimate — not necessarily when its sole aim is to sell an illegal product or provide an illegal service.

*Id.* at 72–73.

The NLRB's assertion of jurisdiction over state-licensed cannabis employers rests on an agency-created policy judgment, not on an unmistakable congressional command. After *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), that is not enough. The Supreme Court held that the Administrative Procedure Act ("APA") requires courts to exercise "independent judgment" in deciding whether an agency has acted within its statutory authority, and that courts may not defer to an agency interpretation merely because a statute is ambiguous. *Id.* at 412.

That rule matters here. The NLRB's cannabis-jurisdiction position has historically depended not on statutory text specifically addressing cannabis but on a General Counsel Advice Memorandum ("Advice Memorandum"), reasoning that the NLRB may assert jurisdiction over medical-marijuana businesses if they meet the NLRB's monetary jurisdictional standards. NLRB Gen. Coun. Advice Mem., *Northeast Patients Group d/b/a Wellness Connection of Maine*, 01-CA-104979, 01-CA-106405 (Oct. 25, 2013). The Advice Memorandum relied on broad Commerce

Clause principles, the employer's out-of-state purchases and revenue, the size of the medical-marijuana industry, state regulation, DOJ enforcement discretion, and OSHA's involvement in the industry. But *Loper Bright* requires the Court—not the NLRB, not the General Counsel, and certainly not an Advice Memorandum—to decide whether Congress actually gave the NLRB statutory authority over this category of employer.

### 1.      The NLRB's reliance on *Gonzales v. Raich* is misplaced.

The NLRB's reliance on *Gonzales v. Raich* in the Advice Memorandum is inapposite.  *See Northeast Patients Group d/b/a Wellness Connection of Maine, NLRB Div. of Advice, Cases 01-CA-104979, 01-CA-106405, October 25, 2013 at p. 9, fn 32.*  In *Gonzales v. Raich,* 545 U.S. 1, 19 (2005), the Supreme Court held that Congress has Commerce Clause power to prohibit local marijuana cultivation and use as part of the Controlled Substances Act's ("CSA") comprehensive regulatory scheme. It did not hold that every federal agency may treat state-licensed cannabis commerce as ordinary lawful commerce under every other federal statute.

This is a critical distinction. The real question is not whether Congress could regulate cannabis labor relations. It is whether Congress actually did so through the NLRA. Under *Loper Bright*, the Court must identify the best reading of the NLRA, not ask whether the Board's view is "reasonable." The Board cannot convert Congress's power to suppress cannabis commerce under the CSA into an implied delegation to promote, stabilize, or administer labor relations in the same federally restricted market.

Notably, given its unlawful status under federal law, several of the states that have enacted medical cannabis legislation that have expressly address labor relations in the medical cannabis that include a "labor peace agreements" requirement, which is common in the public sector.  *See*

Cal. Bus. & Prof. Code § 26051.5(a)(5)(A)–(C); Conn. Gen. Stat. § 21a-421d(a)(2), (c)–(f); 16 Del. C. § 4914A(a)(8); 16 Del. C. § 4919A(y); 16 Del. C. § 4914A(a)(8); 16 Del. C. § 4919A(y); N.J. Stat. Ann. § 24:6I-36(c); N.Y. Cannabis Law § 3(29); § 35(1)(a)(iii), § 35(3)(a)(vii); § 64(1)(i); § 66(5); R.I. Gen. Laws § 21-28.11-12.2(a)–(d); Va. Code § 4.1-1001(A)–(C).  The growing body of state legislation in the area of labor relations is yet another indication that the Board's assertion of jurisdiction is not consistent congressional intent.

**2. The NLRA's "commerce" language should not be stretched to cover federally prohibited cannabis markets absent clear congressional intent to do so.**

The NLRA defines "commerce" as trade, traffic, commerce, transportation, or communication among the states, and defines "affecting commerce" as activity in commerce, or burdening or obstructing commerce or the free flow of commerce. But cannabis is different from ordinary goods.  29 U.S.C. §§ 152(6), (7).

Federal law separately regulates cannabis under the CSA, and 21 U.S.C. § 841 makes it unlawful, except as authorized, to manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense controlled substances.  Nonetheless, the NLRB's theory treats cannabis as ordinary interstate commerce when doing so expands NLRB power, while federal drug law treats cannabis as contraband or highly restricted controlled-substance commerce. A court should not presume Congress silently intended the NLRA's general "commerce" language to bring state-created cannabis markets into the Board's jurisdiction when Congress has addressed cannabis specifically elsewhere and has not amended the NLRA to cover cannabis employers.

### 3. The Board's monetary jurisdictional standards cannot create statutory jurisdiction.

The Advice Memorandum's emphasis on gross revenue and out-of-state purchases does not answer the ultimate statutory question. Monetary thresholds are administrative standards the Board uses after statutory jurisdiction exists; they are not an independent grant of authority. Section 14(c) allows the Board to decline jurisdiction where the effect of a labor dispute on commerce is insufficiently substantial, but that provision presupposes jurisdiction — it does not enlarge the NLRA to reach industries Congress did not place within the Act. 29 U.S.C. § 164(c).

### 4. Thus, the relevant question is not whether the employer meets the Board's ordinary retail or nonretail thresholds. The relevant question is whether the NLRA, properly construed by the Court after *Loper Bright*, reaches a state-licensed cannabis employer whose core business exists only because state law authorizes conduct that federal law separately regulates or restricts. **The NLRB's policy rationale is not entitled to deference.**

The Board's cannabis theory is heavily policy-driven: the industry is large and employs many people; unions organize cannabis workers; labor unrest may affect suppliers; and federal agencies have sometimes interacted with cannabis businesses. Those may be policy arguments for Congress. They are not statutory text.

*Loper Bright* permits courts to give consideration to agency views only to the extent they are persuasive. It does not permit courts to accept agency policymaking as a substitute for congressional authorization. The Advice Memorandum is especially weak as a source of persuasive authority because it is not an NLRB rule adopted through notice-and-comment rulemaking, not a congressional amendment, and not a reasoned judicial construction of the NLRA

12

after *Loper Bright*. It is an enforcement-position memorandum that predates *Loper Bright* and depends on the now-disapproved premise that agencies may fill statutory gaps with broad policy judgments.

For these reasons, TFS is likely to succeed on the merits of its claim that NLRB's assertion of jurisdiction over it is an unlawful exercise of authority, not permitted under the NLRA and reviewable under *Loper Bright*.

## II. TFS is Likely to Succeed on the Merits of Its Constitutional Claims.

Article II of the Constitution mandates that the President must "take care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Although the President exercises his authority through "the assistance of subordinate[]" officers, the Supreme Court has consistently held that Article II requires that executive authority remain vested in the President. *Myers v. U.S.*, 272 U.S. 52, 117 (1926); *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020). That means that the officers of every administrative agency, including "independent" agencies such as the NLRB, must remain subject to the President's oversight and control. *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010). An essential aspect of this oversight and control, according to the Supreme Court, is the "power to remove – and thus supervise – those who wield executive power on the President's behalf." *Seila Law*, 591 U.S. at 204. "Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Id.*

The Court recently solidified its holding that the President must have authority to remove executive officials *at will* with its decision in *Trump v. Slaughter*, 609 U.S. _____ (June 29, 2026). In doing so, the Court will overrule its previous longstanding decision in *Humphrey's Ex'r v. U.S.*,

13

295 U.S. 602 (1935). The decision in *Slaughter* simply confirms that the multiple layers of removal protections in the NLRA impermissibly insulate the NLRB Members and ALJs from removal by the President and are unconstitutional.

## A. NLRB ALJs are Unconstitutionally Insulated from Removal.

In *Jarkesy v. SEC*, 34 F.4th 446, 464 (5th Cir. 2022), *aff'd*, 603 U.S. 109 (2024), the Fifth Circuit applied these principles to find SEC ALJs were inferior officers who exercised significant administrative authority and were unconstitutionally protected from removal because multiple layers of for-cause removal protections stood in the way of the President's ability to remove them. The Fifth Circuit's reasoning was simple and straightforward, relying on *Free Enterprise Fund* and prior Supreme Court precedent:

> SEC ALJs are inferior officers; they can only be removed by the SEC Commissioners if good cause is found by the Merit Systems Protection Board; SEC Commissioners and MSPB members can only be removed by the President for cause; so, SEC ALJs are insulated from the President by at least two layers of for-cause protection from removal, which is unconstitutional under *Free Enterprise Fund.*

*Jarkesy*, 34 F.4th at 464.

Of course, the same is true here with the NLRB ALJs. As a starting point, the NLRB itself has recognized that "Board judges, like SEC judges, are inferior officers" of the executive brand. *See Westrock Servs., Inc.*, 366 NLRB No. 157, slip op. at 1 (2018). Like their counterparts at the SEC, NLRB ALJs "exercise considerable power over administrative case records by controlling the presentation and admission of evidence." *Jarkesy*, 34 F.4th at 464; *see* 29 C.F.R. § 102.35 (setting forth the extensive duties and powers of NLRB ALJs). Among other powers, NLRB ALJs have the power to control the evidence in an NLRB hearing and make critical determinations

14

regarding witness credibility and remedies, which *automatically* become orders of the NLRB if not appealed.

NLRB ALJs are insulated by the same two layers of for-cause removal protection in the very same way as SEC ALJs.  NLRB ALJs may expressly only be removed "for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the [Merit Systems Protection] Board." 5 U.S.C. § 7521(a). Moreover, members of the Merit Systems Protection Board are removable only for "inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d). The protections for NLRB ALJs are even more problematic than the SEC ALJs as the NLRB ALJs are further insulated by a *third* layer of for-cause removal protection where the President may only remove NLRB Members for malfeasance or neglect of duty. 29 U.S.C. § 153(a); *Space Expl. Techs. Corp. v. NLRB*, 741 F.Supp.3d 630, 639 (W.D. Tex. 2024) ("The NLRB ALJ conducting the administrative proceedings against SpaceX has three sets of removal protections[.]").

Supreme Court precedent establishes that these multi-layer removal protections violate Article II because they "not only protect[] [the inferior officers] from removal except for good cause, but withdraw[] from the President any decision on whether that good cause exists." *Free Enterprise Fund,* 561 U.S. at 495. Under binding Supreme Court precedent, TFS is not only likely to, but will, prevail on the merits of this claim. Indeed, several courts have recently reached this very conclusion when they granted preliminary injunctions halting NLRB administrative proceedings. *See Space Expl. Techs. Corp*., 741 F.Supp.3d at 636 ("under current Fifth Circuit law, there is a substantial likelihood that SpaceX succeeds on the merits with regards to showing that the NLRB ALJs are unconstitutionally protected from removal"); *Energy Transfer, L.P. v.*

*NLRB*, 742 F.Supp.3d 755 (S.D. Tex. 2024); *Aunt Bertha v. NLRB*, Case No. 4:24-cv-00798-P, 2024 WL 4202383 (N.D. Tex. September 16, 2024).

### B. NLRB Board Members are Unconstitutionally Insulated from Removal.

The removal provisions that protect NLRB Board Members are likewise unconstitutional. Unlike ALJs, Board Members are principal officers who wield substantial executive power in administering and enforcing the NLRA. And, although Board Members are appointed by the President and confirmed by the Senate as principal officers, the President cannot supervise their work because they may only be removed "for neglect of duty or malfeasance in office, but for no other cause." 29 U.S.C. § 153(a). These restrictions cannot be reconciled with Article II.

In its recent decision in *Slaughter,* the Supreme Court once again recognized the significance of upholding the Constitution's separation of powers requirement. 609 U.S. _____ (2026). After providing a meticulous history of the Separation of Powers doctrine from the pre-Constitution era to the Supreme Court's decision in *Humphrey's Executor* and beyond, Justice Roberts, writing for the Court, concluded:

> Our Constitution creates three branches, but only one President. That President is not all powerful – not by any means…Be he is not impotent either. He and he alone is vested with "[t]he executive Power" of the United States.
>
> To "discharge[e] the duties the duties of his trust," the President must have the assistance of officers he can trust. 30 Writings of George Washington, at 334. Although it is up to the Senate to decide whether to confirm those with whom the President would *prefer* to work, neither Congress nor the courts may saddle him with those with whom he *cannot* work. Subordinates who exercise the President's power are subject to removal by him. Then, and only then, can they remain accountable to the President, and the President to the people.

*Slaughter,* 609 U.S. _____ slip op. *35-36 (emphasis in original). With one fell swoop, the Supreme Court made clear that whatever remained of its 90-plus-year holding in *Humphrey's Executor* was

now overruled.  In doing so, the Supreme Court held that the Federal Trade Commission's enabling statute, which only permits the President to remove FTC Commissioners "for inefficiency, neglect of duty, or malfeasance in office" was "contrary to the separation of powers enshrined in the Constitution.  *Id.* at *2; 15 U.S.C. § 41.

Like the Commissioner in *Slaughter,* the NLRB Board Members wield "substantial executive power," including, but not limited to, the following undeniability executive functions:

- **Policymaking authority**. Through rulemaking under the APA, the NLRB has implemented rules pertaining to (1) the conduct of proceedings under the NLRA, 29 C.F.R. § 102; (2) jurisdictional standards for various industries, 29 C.F.R. §§ 103.1–103.3; and (3) election procedures in representation matters, 29 C.F.R. § 103.20.  The NLRB is actively engaged in rulemaking at the present.

- **Policymaking authority through adjudication**. Recent examples include a new standard for assessing the lawfulness of employer rules and policies under Section 8(a)(1) of the NLRA, which impacts employers throughout the U.S.  *See Stericycle, Inc.*, 372 NLRB No. 113 (2023).

- **Prosecutorial authority**. This prosecutorial power is especially evident in NLRA Section 10(j), which gives the NLRB the "power . . . to petition [a] United States district court . . . for appropriate temporary relief or restraining order" in response to an unfair labor practice. *See Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 852 (5th Cir. 2010) (finding 10(j) petition power to be "prosecutorial in nature").

- **Administrative authority**. This includes the power to appoint "the executive secretary, and such attorneys, examiners, and regional directors, and other such

employees as it may . . . find necessary for the proper performance of its duties." 29 U.S.C. § 154(a).

The removal protections for FTC Commissioners presented to the Supreme Court in *Slaughter* are far less strict than the removal protections for NLRB Board Members. The FTC Commissioners may be removed for "inefficiency, neglect of duty, or malfeasance in office." *Humphrey's Executor*, 295 U.S. at 620. NLRB Board Members, in contrast, are removable only "for neglect of duty or malfeasance in office, but for no other cause." 29 U.S.C. § 153(a). Allowing Congress to eliminate the President's ability to remove principal officers for "inefficiency" would be an unwarranted expansion of the newly minted *Slaughter* holding. In *Collins v. Yellen*, 594 U.S. 220, 256 (2021), the Supreme Court indicated this would be an unsupported expansion: "The President must be able to remove not just officers who disobey his commands but also those who he finds 'negligent and inefficient[.]'" *See also Space Expl. Techs. Corp.*, 741 F.Supp.3d at 637 ("[T]here is a substantial likelihood that SpaceX succeeds on the merits with regards to a finding that the NLRB Members are unconstitutionally protected from removal.")

C. **The NLRB Proceedings Violate TFS's Seventh Amendment Right to a Jury Trial.**

As the Supreme Court has made clear, "The right to trial by jury is 'of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right' has always been and 'should be scrutinized with the utmost care.'" *SEC v. Jarkesy*, 603 U.S. 109, 121 (2024).   This right, enshrined in the Seventh Amendment, guarantees that in "[s]uits at common law . . . the right of trial by jury shall be preserved." U.S. Const. Amend. VII.   In construing the Seventh Amendment's text, the Supreme Court has held "that the right is not limited to the 'common-law forms of action recognized' when the Seventh Amendment was ratified." *Id.*

18

at 122 (citing *Curtis v. Loether*, 415 U.S. 189, 193 (1974)). Rather, the Amendment "embrace[s] all suits which are not of equity or admiralty jurisdiction, whatever maybe the particular form which they assume." *Jarkesy*, 603 U.S. at 110. This includes causes of action based on a statute. *Id.*; *see also Tull v. U.S.*, 481 U.S. 412, 417 (1987).

To determine if a suit is legal as opposed to equitable in nature, courts must consider both the cause of action and the remedy provided, with a primary emphasis on remedy. *Jarkesy*, 603 U.S. at 111. In this case, the NLRB's unfair labor practice action against TFS clearly satisfies both criteria for the determination that the remedies sought in an NLRB proceeding, as adopted by the NLRB in its decision in *Thryv, Inc.*, 372 NLRB No. 22 (Dec. 13, 2022), *enf. denied in part and vacated in part, Thryv, Inc. v. NLRB*, 102 F.4th 727 (5th Cir. 2024), are subject to the protections of the Seventh Amendment.

As an initial point, the claims brought by the NLRB against TFS are tort-like in nature and, therefore, legal claims as opposed to equitable claims.  In determining the nature of a claim, the Supreme Court in *Tull* made it clear that establishing the nature of the statutory action does not require the identification of a precise analogy in 18th-century English common law. 481 U.S. at 421.

Moreover, the remedies sought by the NLRB are clearly legal in nature within the meaning of *Jarkesy* and *Tull*. Specifically, the NLRB has asserted that its standard remedy for the violations at issue require broad monetary relief "to compensate affected employees for all direct or foreseeable pecuniary harms that these employees suffer as a result of the [employer's] unfair labor practice." *See Thryv*, 372 NLRB No. 22, at *1 (2022).  According to the NLRB in *Thryv*, it may award a wide range of monetary damages to address all the following:

- Interest and late fees on credit cards and other credit card debt.

- Penalties based on early withdrawals from a retirement account to cover living expenses.

- Compensation for loss of a home or a car based on an inability to make loan or mortgage payments or rent.

- New or increased transportation or childcare costs.

*Id.* at *15. None of these categories of damages are found in the NLRA, which merely provides for "affirmative action including reinstatement of employees with or without backpay." *See* 29 U.S.C. § 160(c). As the Supreme Court stated in *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993), "compensatory damages," or "monetary relief for all losses . . . sustained as a result of the alleged breach of duties," are "the classic form of *legal* relief."

Finally, the NLRB's expanded remedies do not fall within the narrow "public rights" exception to the Seventh Amendment recognized by the Supreme Court, which permits Congress, in limited instances, to assign a matter for decision to an agency without a jury. In *Jarkesy,* the Supreme Court recognized the extremely limited scope of this exception, which has no textual basis in the Constitution, and held that "matters concerning private rights may not be removed from Article III courts." *Jaresky*, 603 U.S. at 111.

The types of monetary relief the NLRB seeks on behalf of individual employees bear no relation to public rights, and the NLRB cannot avoid this conclusion by slapping the label "equitable" on them. See *Jarkesy*, 34 F.4th at 457 ("Congress cannot change the nature of a right, thereby circumventing the Seventh Amendment, by simply giving the keys to the SEC to do the vindicating."). Nor is there any credible basis for asserting that these expanded remedies (which would likely exceed the amount of backpay) are merely "incidental" to equitable relief. If the types

20

of expanded remedies sought by the NLRB in *Thryv* could be classified as incidental, nothing would remain subject to the Seventh Amendment's requirement for trial by jury.

Because unfair labor practice claims "can be said to 'soun[d] basically in tort,' and seek legal relief," the Seventh Amendment jury guarantee extends to this statutory claim. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999).

### III.    **TFS Will Suffer Irreparable Harm Without a Preliminary Injunction.**

TFS also meets the second requirement for preliminary injunctive relief: irreparable harm. As a starting point, the deprivation of a constitutional right "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). If the NLRB is allowed to proceed with its administrative hearing on July 21, 2026, TFS will be required to appear before insufficiently accountable agency officials who do not have proper jurisdiction over TFS.

However, TFS does *not* allege that merely being subjected to the NLRB proceeding alone constitutes irreparable harm.  TFS recognizes that the Tenth Circuit Court of Appeals has expressly rejected any *per se* rule of irreparable harm in cases involving separation of powers violations with its decision in *Leachco, Inc. v. Consumer Product Safety Commission*, 103 F.4th 748 (10th Circ. 2024).  However, the Tenth Circuit's decision in *Leachco* does not hold that an administrative hearing *can never cause irreparable harm*.  Rather, it holds only that an abstract separation-of-powers objection, unconnected to concrete consequences, is insufficient. Here, the NLRB hearing will inflict additional injuries that cannot be repaired years later after final review of an NLRB decision by the Court of Appeals.

TFS's injury is not speculative.  The NLRB Case is being prosecuted and adjudicated through an agency whose decisional officers are insulated from presidential control at the very

moment the Supreme Court has recognized serious Article II problems with such insulation. *See Slaughter,* 609 U.S. ____ (June 29, 2026).  There is no dispute on that point.  The unconstitutional structure is not collateral to the harm; it is this structure that forces the employer into the very hearing and record-making process that Article II forbids.

As detailed above, if forced to proceed with the administrative hearing, TFS will be subject to irreparable harm that is not speculative and that cannot be remedied by a final review of the federal Court of Appeals.  Among other things, by the time of appellate review, much of the harm resulting from the NLRB's unconstitutional structure will already be complete.  As a starting point, the NLRB – through its Chairman James Murphy – has already issued subpoenas requiring the attendance of 9 witnesses and the production of various documentation.  [*See* Ex. A and B]

Under the NLRB Rules and Regulations, NLRB ALJs exercise considerable power over administrative case records by controlling the presentation and admission of evidence during unfair labor practice hearings, including the power to make key credibility determinations that are subject to an extraordinarily high level of deference by both the reviewing NLRB and subsequent Court of Appeals.  As the NLRB has held, an NLRB ALJ's credibility determinations may only be reversed if a "clear preponderance of the *all* the relevant evidence convinces [the Board] that [they are] incorrect." *Standard Dry Wall Products, Inc.*, 91 NLRB 544, 545 (1950), *enforced*, 188 F.2d 362 (3d Cir. 1951).  Moreover, the standard for reversal of an NLRB ALJ's credibility determinations becomes even more deferential once the case gets to the Court of Appeals for review.  As the Tenth Circuit Court of Appeals recently reiterated: "[W]e will not disturb the NLRB's determinations of witness credibility or lack thereof except in rare circumstances." *3484,*

*Inc. v. NLRB*, 137 F.4th 1093, 1110 (10th Cir. 2025) (quoting *Albertson's, Inc. v. NLRB*, 161 F.3d 1231, 1236 (10th Cir. 1998)).

Therefore, once the July 21, 2026 administrative hearing takes place, TFS will be subject to credibility determinations made by an unconstitutionally insulated NLRB ALJ, which may only be reversed on subsequent appellate review *in the rarest of circumstances*. Those credibility determinations often provide the basis for the NLRB ALJ's findings on liability. This is the very definition of irreparable harm.

Moreover, unlike in *Leachco,* TFS cites harm beyond just that resulting from the NLRB's Separation of Powers violations. In addition to the two Separation of Powers violations based on the unlawful removal provisions, TFS further alleges it suffered an individual violation of its constitutional rights by the NLRB's deprivation of its right to a jury trial under the Seventh Amendment of the Constitution. The Tenth Circuit has recognized that when an alleged constitutional right is involved, no further showing of irreparable injury is necessary. *Planned Parenthood Association of Utah v. Herbert*, 828 F.3d 1245 (10th Cir. 2016). In *Herbert,* the Tenth Circuit applied this principle and held that the likelihood of a First Amendment violation, standing alone, gives rise to irreparable injury. *Id.* at 1263. Similarly, in *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792 (10th Cir. 2019), the Tenth Circuit stated broadly that "[a]ny deprivation of any constitutional right fits that bill" for irreparable harm because monetary remedies are inadequate to compensate for constitutional violations involving individual rights. *Id.* at 806. In *Free the Nipple,* the Court also observed that in the context of constitutional claims, the doctrine collapses the first and second preliminary injunction factors, equating likelihood of success on the merits with a demonstration of irreparable injury. *Id.*

23

As the Supreme Court has recognized, the Seventh Amendment provides parties, such as TFS, with "a personal right" that "is subject to waiver, just as are other personal constitutional rights that dictate procedures by which civil . . . matters must be tried." *Hetrick Companies LLC v. IINK Corp.*, 710 F.Supp.3d 467, 492 (E.D. Va. 2024) (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986)).  In the hearing, the NLRB seeks remedies for TFS's termination of four employees in violation of the NLRA, which includes the purely legal remedies unlawfully authorized by the Board in *Thryv*.[1]  The NLRB's imposition of purely legal damages, pursuant to the NLRB's holding in *Thryv* implicates TFS's individual rights under the Seventh Amendment.  The moment that the NLRB's hearing begins before a (constitutionally defective) ALJ which may result in an award of legal damages beyond the "affirmative action" authorized under Section 10(c) without a jury, the damage to TFS is done.  *See Burgess v. FDIC*, 639 F.Supp.3d 732, 749 (N.D. Tex. 2022) (observing "[s]ince the Court has determined that Plaintiff was entitled under the Seventh Amendment to a jury trial, the irreparable injury requirement is automatically satisfied without the need to consider Plaintiff's particular showings of irreparable harm").

Finally, although unnecessary, these unconstitutional proceedings will also cause TFS economic harm. Responding to the charges and preparing for the upcoming hearing has required, and will continue to require, extensive preparation by TFS and its counsel, diverting resources

---

[1] As the Board recognized as recently as June 1, 2026, its imposition of legal damages under *Thryv* will remain in effect for the time being.  In a number of recent decisions, Chairman Murphy and Member Mayer have stated that they would continue to apply *Thryv* until such time as a three-member majority of NLRB decides to overrule the *Thryv* decision. *See Floss N Gloss PA*, 374 NLRB No. 122, fn. 2 (2026); *Performance Plumbing, LLC*, 374 NLRB No. 48, slip op. at 2, fn. 2 (2026); *Lodi Volunteer Ambulance Rescue Squad, Inc.*, 374 NLRB No. 26, slip op. at 3, fn. 3 (2026).

from its efforts to provide its patients with access to medical cannabis. Moreover, the publicity attendant to this litigation is likely to harm TFS's reputation, which is elemental to its success. As the Fifth Circuit noted in *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017), a "decision pursuant to a constitutionally infirm hearing that injured petitioner's 'reputation'" was "sufficient to satisfy irreparable injury."

As explained above, TFS is not seeking an injunction simply to avoid unrecoverable litigation expenses. The harm is the hearing's irreversible adjudicatory consequences: compelled testimony, public disclosure, creation of the administrative record, and the ALJ credibility findings entitled to substantial deference.

## IV.    The Balance of Harms and Public Interest Favor a Preliminary Injunction.

As the Supreme Court has held, where the government is a defendant, the balance of harms and the public interest factors are considered together. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In this case, both factors favor preliminary injunctive relief.

Given the high likelihood of success on the merits, an injunction would not harm Defendants because the government does not suffer a cognizable harm from "stopping the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. In the Tenth Circuit, where a law or governmental action is likely unconstitutional, the government's interest "do[es] not outweigh" a plaintiff's interest in having its constitutional rights protected. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc) (plurality) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012)); see also *Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1188 (D. Colo. 2023) (same). The public interest likewise favors remedying unconstitutional government action and upholding constitutional rights. *Awad*, 670

F.3d at 1132. Accordingly, any interest the NLRB might assert in enforcing an unlawful – and likely unconstitutional – proceeding cannot outweigh TFS's interest in avoiding irreparable harm. In contrast, the harm to TFS is irreparable if the NLRB hearing scheduled to begin on July 21, 2026 proceeds.

DATED: July 8, 2026

**VALLIS LEGAL, PLLC**

/s/ Philip L. Martin
Philip L. Martin (USB 11923)
1445 North 1200 West
Orem, UT 84057
(385) 429-0484
philip@vallislegal.com

**BRUECKNER SPITLER SHELTS PLC**

/s/ Jeffrey W. Toppel
Jeffrey W. Toppel (*pro hac vice application pending*)
8355 East Hartford Drive, Suite 200
Scottsdale, Arizona 85255
(480) 483-9600
jtoppel@bss.law
*Attorney for Plaintiff The Flower Shop*